# In the United States District Court for the Southern District of Georgia Waycross Division

| | | |
|---|---|---|
| TADESSES BUTLER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 514-055 |
| | * | |
| THE CITY OF DOUGLAS, GEORGIA; | * | |
| KERRY MOORE; JOSEPH STEWART; | * | |
| DUSTIN PEAK; and JOSEPH | * | |
| BRACKETT, | * | |
| | * | |
| Defendants. | * | |

## ORDER

This case is before the Court on a Motion for Summary Judgment filed by Defendants The City of Douglas, Georgia (the "City"); Kerry Moore ("Moore"); Joseph Stewart ("Stewart"); and Joseph Brackett ("Brackett") (collectively, "Defendants"). Dkt. No. 43.[1] Plaintiff Tadesses Butler ("Plaintiff") has filed a Response in opposition to Defendants' Motion, dkt. no. 61, and Defendants have filed a Reply thereto, dkt. no. 69. For the following reasons, Defendants' Motion (dkt. no. 43) is **GRANTED in part** and **DENIED in part** as follows: The Motion is **GRANTED** to the extent that it seeks summary judgment in Defendants' favor

---

[1] Defendant Dustin Peak ("Peak") also joined in filing the instant Motion, see dkt. no. 43; however, the parties thereafter made a Consent Motion to Dismiss Peak as a Defendant in this case, dkt. no. 59, which the Court granted on October 13, 2015, dkt. no. 64.

on all Plaintiff's claims against Stewart and Brackett; all state-law claims against Moore other than the official-capacity unreasonable search and seizure claim; the federal claim against Moore for punitive damages; and all claims against the City other than the claim of unreasonable search and seizure under state law. Defendants' Motion is **DENIED** insofar as it requests summary judgment on Plaintiff's federal civil rights claim against Moore and state-law claims of unreasonable search and seizure against Moore in his official capacity and the City.

## BACKGROUND

On June 14, 2013, Plaintiff spent the evening at a bowling alley. Dkt. No. 43-1 (Defendants' Statement of Material Facts Not in Dispute, hereinafter "SMF"), ¶ 1.[2] Plaintiff left the bowling alley around midnight and drove, in his girlfriend's vehicle, to his friend's house in Douglas, Georgia. Id. at ¶ 3; see also Dkt. No. 58-1 (Plaintiff's Declaration, hereinafter "Pl.'s Decl."), ¶ 2. Upon arriving at this friend's house, Plaintiff met a woman named Laura Reliford ("Reliford"), who was a known prostitute having elicited several complaints from local hotel owners about her efforts to solicit their customers. SMF,

---

[2] Plaintiff has filed a Response largely agreeing with, or otherwise not objecting to, Defendants' recitation of the facts of this case. Dkt. No. 61-5 (Plaintiff's Response to Statement of Material Facts, hereinafter "Pl.'s Resp. to SMF"). Accordingly, the Court, for ease of exposition, cites only to Defendants' version of the facts (dkt. no. 43-1) as the SMF and specifically notes herein any facts with which Plaintiff disagrees in whole or in part.

¶¶ 4-5.  Plaintiff's friend indicated that he and Reliford had been arguing that night and asked Plaintiff to give her a ride home.  Id. at ¶ 7.  Plaintiff agreed to his friend's request and left the house with Reliford.  Id. at ¶ 8.

## I.  Traffic Stop

In the early morning hours of June 15, 2013, Stewart, a sergeant with the City of Douglas Police Department, was on patrol in the area around Plaintiff's friend's house.  Id. at ¶ 10.  Stewart noticed Plaintiff's vehicle pull into the driveway of what he believed, at the time, was an abandoned house.  Id.[3] Stewart observed Plaintiff's vehicle drive around to the rear of the house and, within moments, come back down the driveway.  Id. at ¶¶ 11-12.

According to Plaintiff, he pulled out of the driveway and had begun heading west when he passed by Stewart's police car travelling in the opposite direction.  Pl.'s Decl., ¶ 11.  Plaintiff asserts that Stewart immediately turned his car around and activated his blue lights, at which time Plaintiff promptly pulled his vehicle over to the side of the road.  Id. at ¶¶ 13-

---

[3] Plaintiff denies this fact only to the extent of arguing that Stewart's belief that the house was abandoned was objectively unreasonable, because the house, which was that belonging to Plaintiff's friend, was easy to see and had lights on.  Pl.'s Resp. to SMF, ¶ 10.  However, when asked at his deposition, "If you did not know that [your friend] lived at that house, would you think that it's possible that it could have been abandoned?" Plaintiff responded, "Yes," based on "[t]he way it looked."  Pl.'s Dep., 47:10-15.  Additionally, Plaintiff does not contend, and the evidence does not suggest, that Stewart did not, in fact, entertain this belief.

AO 72A
(Rev. 8/82)

14. Plaintiff maintains that his vehicle at that time was located on a public road, rather than a driveway or other private property, just barely past his friend's house. Id. at ¶¶ 15-16.

Stewart, by contrast, contends that he saw Plaintiff's vehicle pull out of the driveway and travel further down the road, passing a cross street and reaching a point where the road dead ends at a private driveway. Dkt. No. 49 (Stewart Deposition, hereinafter "Stewart Dep."), 32:1-4, 37:11-25. Stewart states that Plaintiff pulled into the private driveway, which Stewart knew belonged to a prominent member of the community. Id. According to Stewart, it was at that moment that he decided to activate his blue lights and pull Plaintiff over. Id. at 38:25-39:1. Stewart explains that because there had been a lot of burglaries in the area, and Plaintiff's vehicle was entering private property after 2:00 AM, he wanted to check the identity of the operator of the vehicle before allowing it to venture further. Id. at 32:6-7, 39:14-40:8.

Stewart approached the vehicle and asked Plaintiff to exit. SMF, ¶ 18. Plaintiff recalls Stewart mentioning something about an abandoned house, to which Plaintiff responded that the house belonged to his friend, and that he went there to pick someone up. Pl.'s Decl., ¶ 18. Plaintiff handed Stewart his driver's license, and Stewart radioed the dispatcher to have his license

number and the vehicle's tag number checked.  SMF, ¶¶ 18-19.

The dispatcher responded, stating Plaintiff's name and, "[N]o

warrants."  Dkt. No. 55, 2:43.

## II.  Additional Questioning, Pat Down, and Vehicle Search

Within seconds of hearing the dispatcher's response, Moore

called over the radio to Stewart, "1071."  Id. at 2:51.  "1071"

is a code used to warn that an individual is "possibly known for

. . . contraband, possibly drugs."  Stewart Dep., 42:1-3.[4]  Moore

had heard Stewart call out Plaintiff's name to the dispatcher

and immediately recognized it, because Moore had been present

when Plaintiff was arrested and convicted of a drug-related

offense on a prior occasion.  Dkt. No. 50 (Moore Deposition,

hereinafter "Moore Dep."), 75:3-76:5.  In particular, Plaintiff

had pled guilty to selling cocaine in 2009.  SMF, ¶ 6.

Brackett, who also had heard Stewart's radio call and begun

heading in his direction, was pulling up to the scene of the

stop when he heard Moore's "1071" warning over the radio.  Id.

at ¶ 23; see also Brackett Dep., 28:19-29:6.

Stewart, wanting to "investigate further" after receiving

the "1071" call, continued speaking with Plaintiff and the

female passenger.  Stewart Dep., 55:2-5, 57:13-20.  Stewart

---

[4]  Plaintiff makes much of the fact that Moore only spoke the word
"1071" without describing what it meant.  See Pl.'s Resp. to SMF, ¶
22.  The officers' testimony, however, indicates that they uniformly
understood "1071" to mean potential involvement of contraband or drug
activity.  See, e.g., Dkt. No. 51 (Brackett Deposition, hereinafter
"Brackett Dep."), 29:4-6; Stewart Dep., 42:1-3.

AO 72A
(Rev. 8/82)

asked the passenger for her name, and she responded, "Bowen."
Id. at 41:21-22; see also SMF, ¶¶ 20-21; Pl.'s Resp. to SMF, ¶¶
20-21. Stewart called in to the dispatcher to run a warrant
check for a "Renee Bowen Jowers." Dkt. No. 55, 3:15. The
dispatcher advised Stewart that there were no outstanding
warrants for a "Renee Jowers." Dkt. No. 61, Ex. 1.

Brackett, who had gotten out of his police car by that
time, listened to this exchange. Brackett Dep., 43:23-44:10.
According to Plaintiff, Brackett then performed an exterior pat
down of Plaintiff's body, "just placing his hands on the outside
of [Plaintiff's] clothing." Pl.'s Decl., ¶ 21. Brackett then
asked Plaintiff if he could search his vehicle, and Plaintiff
agreed. Id. at ¶ 21; Brackett Dep., 44:10-13. Brackett
explains that he conducted the search based on Moore's "1071"
call. Brackett Dep., 46:14-20. Plaintiff stood at the back of
the vehicle while Brackett searched the inside. Pl.'s Decl., ¶
23.

During this time, Moore arrived at the scene along with
Justin Kelly ("Kelly"), an officer whom Moore was training that
evening. SMF, ¶ 27.[5] Moore instantly recognized the female
passenger and asked Stewart whether she had given him her name.
Id. at ¶¶ 27-28. When Stewart responded with the name "Bowers,"
Moore informed him that it was fake, and that "Reliford" was her

---

[5] Kelly is not a named Defendant in this case.

AO 72A
(Rev. 8/82)

real name.  Id. at ¶¶ 28-29.  According to Moore, he had

arrested Reliford for drunkenness and obstruction on a previous

occasion, and he was familiar with her history of prostitution

and reputation as a drug user.  Moore Dep., 62:16-65:19.  Based

on Moore's identification of Reliford, Stewart arrested her for

giving false information to a police officer.  SMF, ¶ 29.

Moore approached Plaintiff and asked, "[D]o you have

anything on you?" to which Plaintiff said, "No, Sir."  Pl.'s

Decl., ¶ 25.  Moore then inquired, "Do you mind if I search

you?" and Plaintiff replied, "[Y]es you can."  Id. at ¶ 26; see

also SMF, ¶ 30; but see Pl.'s Resp. to SMF, ¶ 30; Pl.'s Dep.,

53:4-20.[6]  Moore reasons that he had no idea whether Plaintiff

---

[6]  Although Plaintiff's Declaration uses broad language in quoting
Moore's request to conduct a body search, Plaintiff's Response to the
SMF cites language from his deposition that he contends narrows this
request from that of a general body search to only a pat down:

> 4    **A. When he looked in the truck, he patted me down.**
> 5    Q. Did he ask you for permission to search
> 6    you, like your body?
> 7    A. He told me to turn around, (nods head
> 8    affirmatively.)
> 9    Q. Did he tell you to turn around, or did he
> 10   say: **Do you mind if I pat you down?**
> 11   **A. Yes, sir.**
> 12   Q. That's what he said?
> 13   **A. That's what he said,** (nods head
> 14   affirmatively.)
> 15   Q. And did you say yes, I mean, did you say,
> 16   No, I don't mind?
> 17   **A. I told him I don't mind, because I know**
> 18   **that's the procedure --**
> 19   Q. Okay.
> 20   **A. -- when you're on probation.**

AO 72A
(Rev. 8/82)

was armed and dangerous but suspected that he was, based on his body language at the time, including his perceived nervousness, frequent grabbing of his crotch area, and general stature. Moore Dep., 47:12-48:9.[7] Moore patted Plaintiff down and searched his pockets, without finding anything. See Pl.'s Decl., ¶ 26.

Around this time, Plaintiff informed the officers that he was on probation, a fact already known by Moore. SMF, ¶¶ 32-33. Plaintiff understood that, as a condition of his probation, he had waived his Fourth Amendment rights regarding the search of his person and his belongings. Id. at ¶ 34; Pl.'s Dep., 53:17-20. As such, when Moore proceeded to ask, "You don't mind if I search your vehicle?" Plaintiff gave him the "go ahead." Pl.'s Dep., 60:7-13.[8] According to Moore, at that time, he was aware of several facts that informed his suspicion that there could have been contraband in the truck: Plaintiff's body language, including not only his nervousness and grabbing of his crotch area but also his posture, eye movements, and shifting of his

_____

Pl.'s Resp. to SMF, ¶ 30 n.1 (emphasis in original) (quoting Pl.'s Dep., 53:4-20).

[7] Plaintiff maintains that he never grabbed at his crotch area, or otherwise pulled at the waistband of his shorts or underwear, while in the presence of the officers. Pl.'s Decl., ¶ 32.
[8] While Plaintiff's deposition testimony frames this exchange as a question and answer, his declaration describes it somewhat differently, stating that Moore's response to discussing his probation was, "Well, then you don't mind if I search your vehicle." Id. at ¶ 27.

AO 72A
(Rev. 8/82)

weight back and forth[9]; his prior conviction on a drug-related charge; his repeated warnings to the officers that "if anything was in that truck 'it ain't mine' because he had just bought it"; his travelling with a prostitute, who also was known for drug use and had just lied about her identity; and a known history of drug use and other illegal activity at the friend's house that Plaintiff had just visited. Moore Dep., 51:21-52:11, 55:9-14, 58:20-22, 66:24-67:22. Nevertheless, neither Moore nor any other officer ultimately found any illegal substances in Plaintiff's vehicle. See id. at 100:6-8.

## III. Strip Search

After searching the vehicle, Moore returned to where Plaintiff was standing to conduct a more thorough body search. See Pl.'s Decl., ¶ 28. Moore asserts that even though he knew that nothing was found in the vehicle search, that fact did not affect whether Plaintiff may have had contraband on his body. Moore Dep., 100:13-20. Moore directed Plaintiff to remove his shoes and socks, and, once he had, Moore looked them over. SMF, ¶ 35.

Plaintiff's version of the subsequent events proceeds as follows: Moore then led Plaintiff to the front of the vehicle, Pl.'s decl., ¶ 28, so that they were standing between the front

---

[9] Again, Plaintiff asserts that he did not grab at his crotch area at any point during the period of time in question. Id. at ¶ 32.

bumper and the front wheel on the driver's side, Pl.'s dep., 62:19-22, 63:8-11. At that time, all of the police cars were behind Plaintiff's vehicle, and the driver's door of the vehicle sat open "like a shield." Pl.'s Dep., 63:6-7, 13-14. Moore asked Plaintiff to raise his shirt up and, pointing a flashlight up and down Plaintiff's body, announced, "I can't see nothing." Pl.'s Decl., ¶ 30. Moore aimed the flashlight at Plaintiff's shorts and instructed him, "Drop them." Id. at ¶ 31. Plaintiff "put [his] hands on [his] shorts and boxers and opened them to where they were a little lower down [his] body. [His] genitals were visible by looking down [his] pants, but they were not yet fully exposed." Id. Moore again declared, "I can't see nothing" and directed Plaintiff to remove his underwear. Id. Plaintiff obliged, "dropp[ing] the shorts and boxers down to mid-thigh," such that his "genitals were fully exposed to Moore," id., for "a few seconds," SMF, ¶ 40. After shining the flashlight at Plaintiff's genitals, Moore allowed Plaintiff to pull his clothes back up. Pl.'s Decl., ¶ 31.[10]

Moore, however, tells a different story, saying that once they went to the front of the vehicle, he asked Plaintiff

---

[10]  Plaintiff also avers that "it is obvious from the testimony that the field strip search was viewed by . . . Reliford." Pl.'s Resp. to SMF, ¶ 41. Plaintiff has offered an affidavit of Reliford in which she attests that Moore "ordered [Plaintiff] to pull his pants or shorts down," and that Plaintiff "reluctantly complied with the officer's demand." Dkt. No. 58-2 (Reliford Affidavit, hereinafter "Reliford Aff."), ¶ 8.

AO 72A
(Rev. 8/82)

whether he had anything on his person or in his shorts. Moore
Dep., 110:12-14, 120:5-6. Moore maintains that Plaintiff
responded, "[N]o" and, on his own volition, proceeded to pull
his shorts "out a little bit and kind of down a little bit" to a
point right at his crotch area. Id. at 110:14-16, 115:11-12.
In doing so, Moore contends, Plaintiff dropped only his shorts,
so that Moore saw his underwear but never saw his genitals. Id.
at 117:10-16.[11]

The parties agree that no civilian, other than Reliford,
was at or near the scene or otherwise passed by while Plaintiff
was being searched. See SMF, ¶ 41; Pl.'s Resp. to SMF, ¶ 41.
Once the strip search was complete, Moore allowed Plaintiff to
walk to the back of the vehicle to retrieve his shoes and socks.
Pl.'s Dep., 64:1-4. While doing so, Plaintiff noticed that
Reliford was sitting in the back of a police car to be taken to
the jail. Id. at 64:1-10.

**IV. Conclusion of the Stop**

---

[11] As for the other officers, Stewart asserts that he never saw or
heard anything about Plaintiff pulling his pants down or otherwise
disrobing in any way. Stewart Dep., 85:18-22. Brackett similarly
denies having seen any bodily search of Plaintiff, maintaining that he
was searching the vehicle at that time. Brackett Dep., 64:12-19.
Kelly, on the other hand, has testified that, as he was shadowing
Moore as part of his training, he accompanied Moore and Plaintiff to
the front of the vehicle and witnessed Moore direct Plaintiff to take
his shirt off, unbutton his shorts, pull his shorts down to mid-thigh,
and pull the waistband of his underwear out a little bit. Dkt. No. 52
(Kelly Deposition, hereinafter "Kelly Dep."), 44:21-24, 48:16-49:4,
51:6-52:9.

AO 72A
(Rev. 8/82)

Once Plaintiff returned to the back of the vehicle, the officers informed him that he could go. Pl.'s Dep., 64:1-4. Brackett was the first to leave the scene, after which Stewart departed to transport Reliford to the jail. See id. at 65:7-20. Within minutes of their departure, Moore and Kelly left Plaintiff with the vehicle, free to continue to his destination. See id. at 65:19-20; SMF, ¶¶ 45-46; Pl.'s Resp. to SMF, ¶¶ 45-46.[12]

## V.    Plaintiff's Filing of Suit

Plaintiff filed suit against Defendants in this Court on July 24, 2014. Dkt. No. 1. Plaintiff brings claims pursuant 42 U.S.C. § 1983 ("Section 1983") against Stewart, Brackett, and Moore in their individual capacities. Id. at ¶¶ 2, 52. Plaintiff alleges that these Defendants violated his rights under the Fourth Amendment to the United States Constitution by prolonging his detention, extensively searching his vehicle, and forcing him to participate in a field strip search. Id. at ¶ 52. Additionally, Plaintiff claims that these Defendants, in both their individual and official capacities, and the City are subject to liability under Georgia law for violating Plaintiff's state-law rights to be free from unreasonable searches and

---

[12]  Plaintiff maintains that his vehicle had run out of gas during the stop, and that he remained on the side of the road for a period of time after the officers left. See SMF, ¶ 46; Pl.'s Resp. to SMF, ¶ 46.

seizures, intentional infliction of emotional distress, invasion of privacy, and abuse in being arrested. Id. at ¶¶ 2, 53. Plaintiff asserts that the City is further liable under state law for failing to supervise and negligently retaining, hiring, and training the officers. Id. at ¶ 53. Finally, Plaintiff seeks punitive damages from Moore under federal and state law, on the grounds that he acted in bad faith and with wanton disregard for Plaintiff's rights, as well as attorneys' fees from Moore and the City pursuant to O.C.G.A. § 13-6-11. Id. at ¶ 55.

Defendants now move for summary judgment on all of Plaintiff's claims, dkt. no. 43, and have submitted transcripts of the depositions of Plaintiff and several officers in support, dkt. nos. 45-46, 49-52. Plaintiff has responded in opposition to Defendants' Motion, dkt. no. 61, and filed, in relevant part, his own Declaration made under penalty of perjury, the Reliford Affidavit, a recorded interview of Moore, an audio recording and report of the officers' communications with dispatch, and information regarding the City's insurance coverage for law enforcement officers, dkt. nos. 55-58 & 61, exs. 1-2.[13]

---

[13] With respect to the City's insurance coverage, Plaintiff has submitted a copy of a document entitled, "Common Policy Declarations," which was issued by the City's insurer and was produced by Defendants to Plaintiff during the discovery period. Dkt. No. 57. The Common Policy Declarations relate to the policy period from June 15, 2013, to June 15, 2014, and state that the City's liability coverage included, among other things, "Law Enforcement Liability," in an amount up to

Defendants have filed a Reply to the Response, dkt. no. 69, and their Motion is now ripe for review.

## STANDARDS OF REVIEW

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there

---

$1,000,000 for each wrongful act or $3,000,000 in the aggregate. Id. at pp. 3, 5.

AO 72A
(Rev. 8/82)

is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

The Court first addresses the evidence that will be considered in ruling on Defendants' Motion for Summary Judgment,

before evaluating Defendants' Motion as to each of Plaintiff's claims under the above-described standards.

## I. Evidence Considered

Much of the parties' evidence concerning the events that transpired in the early morning hours of June 15, 2013, is consistent or differs in only some immaterial way. However, Plaintiff's version of the events just prior to the initial traffic stop, as well as the events during the field strip search, differs wildly from that of Defendants and, therefore, warrants further discussion here.

A court, on summary judgment, must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson, 234 F.3d at 507. As a result, where the facts evidenced by the moving party conflict with those of the nonmoving party, the court is "required to credit [the nonmovant's] version of the facts, even if other evidence in the record is more favorable to him." Valderrama v. Rousseau, 780 F.3d 1108, 1115 (11th Cir. 2015) (citing Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005)). In doing so, however, the court's "duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the court[] owe[s] a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided." Id.

AO 72A
(Rev. 8/82)

(quoting *Evans*, 407 F.3d at 1278). In other words, "[w]hen the nonmovant has testified to events," the court does not "pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that [the court] deem[s] most helpful to the nonmovant." *Id.* (quoting *Evans*, 407 F.3d at 1278).

In the case at bar, the parties give essentially incompatible versions of what happened during the time period between Stewart seeing Plaintiff pull out of his friend's driveway and Stewart approaching Plaintiff's vehicle and asking for his driver's license. Plaintiff's sworn testimony indicates that just after he pulled out of the driveway, he crossed paths with Stewart, noticed Stewart immediately turn around and activate his blue lights, and pulled his vehicle over to the side of the public road just past his friend's driveway. Pl.'s Decl., ¶¶ 11, 13-14, 15-16. Stewart, on the other hand, testifies that he observed Plaintiff's vehicle travel much further down the road, past a cross street, and pull into a private driveway, at which time he turned on his lights and pulled Plaintiff over at that location. Stewart Dep., 32:1-4, 37:11-25, 38:25-39:1. Because these accounts are fundamentally different, the Court is obligated, at this stage, to accept Plaintiff's version as true.

The parties also are at odds with respect to the events surrounding the strip search. According to Plaintiff, Moore led him to the front of the vehicle, instructed him to raise his shirt, pointed a flashlight at his shorts, directed him to "drop them," and then ordered that he pull down his underwear. Pl.'s Decl., ¶¶ 28, 30-31. Plaintiff maintains that he "dropped [his] shorts and boxers down to mid-thigh," such that his "genitals were fully exposed to Moore." Id. at ¶ 31. Moore, however, states that he asked Plaintiff whether he had anything on his person or in his shorts, and that Plaintiff responded, "[N]o" and pulled only his shorts down to a point right at his crotch area, so that Moore could see his underwear but not his genitals. Moore Dep., 110:12-16, 115:11-12, 117:10-16, 120:5-6.[14] The Court accepts Plaintiff's account of the events occurring during the strip search in full for the purpose of ruling on the instant Motion.

## II.   Section 1983 Claims Against Stewart, Brackett, and Moore in Their Individual Capacities

Defendants maintain that summary judgment is proper on Plaintiff's Section 1983 claims against the Defendant officers in their individual capacities, because the officers are

---

[14] Although corroboration is not necessary at this point, the record shows that one officer, Kelly, gives a version similar to Plaintiff's and quite different from that of Moore. Kelly Dep., 44:21-24, 48:16-49:4, 51:6-52:9 (stating that Moore directed Plaintiff to take off his shirt, unbutton his shorts, pull his shorts down to mid-thigh, and pull the waistband of his underwear out a little bit but not down).

entitled to the protections of qualified immunity. Dkt. No. 43-2, pp. 6-12.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir. 2007) (quoting Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003)). A government official who raises qualified immunity as an affirmative defense "must initially establish that he was acting within his discretionary authority." Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007). If it is shown that the official was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." Id. at 1136-37.

For the plaintiff to overcome qualified immunity, he must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing Wilson v. Layne, 526 U.S. 603, 609 (1999)); see also Davis v. Self, 547 F. App'x 927, 933 (11th Cir. 2013) ("Meanwhile, as the Supreme Court recently reiterated, '[q]ualified immunity . . . protects all but the

plainly incompetent or those who knowingly violate the law.'"
(alterations in original) (quoting Messerschmidt v. Millender,
132 S. Ct. 1235, 1244 (2012))). "If the plaintiff prevails on
both prongs of this test, then the defendant is unable to obtain
summary judgment on qualified immunity grounds." Holloman ex
rel. Holloman, 370 F.3d at 1264.

### A. Discretionary Function

An officer was acting in the scope of his discretionary
authority if he was "(a) performing a legitimate job-related
function (that is, pursuing a job-related goal), (b) through
means that were within his power to utilize." Id. at 1265-66
(citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185
n.17 (11th Cir. 1994)). This test requires analyzing the
"general nature of the defendant's action, temporarily putting
aside the fact that it may have been committed for an
unconstitutional purpose, in an unconstitutional manner, to an
unconstitutional extent, or under constitutionally inappropriate
circumstances." Id. at 1266. For the first prong, "the
defendant must have been performing a function that, but for the
alleged constitutional infirmity, would have fallen with[in] his
legitimate job description." Id. (emphasis omitted).

For the second prong, the Court must determine whether the
officer was "executing the job-related function—that is,
pursuing his job-related goals—in an authorized manner." Id.

AO 72A
(Rev. 8/82)

> Each government employee is given only a certain
> "arsenal" of powers with which to accomplish [his]
> goals. For example, it is not within a teacher's
> official powers to sign her students up for the Army
> to promote patriotism or civic virtue, or to compel
> them to bring their property to school to redistribute
> their wealth to the poor so that they can have
> firsthand experience with altruism.

Id. at 1267. Qualified immunity does not protect one who

pursues a job-related goal through means "fall[ing] outside the

range of discretion that comes with an employee's job." Id.

In the instant matter, it appears relatively undisputed

that Stewart, Brackett, and Moore were acting in the scope of

their discretionary authority when the alleged constitutional

violations occurred. See Dkt. No. 43-2, pp. 7-8; Dkt. No. 61,

pp. 14-21. It is squarely within the realm of an on-duty police

officer's legitimate job-related functions to conduct a traffic

stop and ascertain whether the circumstances warrant further

investigation and perhaps the help of additional officers.

Moreover, Plaintiff does not contend—and nothing in the record

indicates—that either Stewart, Brackett, or Moore used

unauthorized means to fulfill these job-related goals. Rather,

because it is undisputed that these Defendants were acting

within their duties as police officers of the City of Douglas

Police Department when the alleged constitutional violations

occurred, Defendants have sustained their burden of showing that

they were acting in their discretionary capacities. The burden

AO 72A
(Rev. 8/82)

thus shifts to Plaintiff to demonstrate that qualified immunity nevertheless does not protect the officers' conduct.

**B. Violation of a Constitutional Right**

The Fourth Amendment guarantees citizens the right to be free from unreasonable searches and seizures of their person and property.  U.S. Const. amend. IV.

### 1. Initial Traffic Stop

"It is well established that 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'"  Hargis v. City of Orlando, 586 F. App'x 493, 499 (11th Cir. 2014) (quoting Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000)).  Reasonable suspicion of criminal activity must exist at the time that the officer makes the stop, and cannot be based on facts that he discovers thereafter.  United States v. Pruitt, 174 F.3d 1215, 1221 n.4 (11th Cir. 1999) (citing Scott v. United States, 425 U.S. 917, 923 (1976) (Brennan, J., dissenting from the denial of certiorari)).  In determining whether an officer had reasonable suspicion to conduct a stop, a court must consider the totality of the circumstances and assess whether the officer had "a particularized and objective basis for suspecting criminal activity."  Hargis, 586 F. App'x at 499 (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)).  Reasonable suspicion thus

requires "more than just a hunch." United States v. Lee, 68
F.3d 1267, 1271 (11th Cir. 1995) (citing United States v.
Sokolow, 490 U.S. 1, 7-8 (1989)). Even so, "for reasonable
suspicion to exist, 'the likelihood of criminal activity need
not rise to the level required for probable cause, and it falls
considerably short of satisfying a preponderance of the evidence
standard.'" Hargis, 586 F. App'x at 499 (quoting Arvizu, 534
U.S. at 274). Furthermore, "[w]hen an officer asserts qualified
immunity, the issue is not whether reasonable suspicion existed
in fact, but whether the officer had arguable reasonable
suspicion to support an investigatory stop." Id. (alteration in
original) (quoting Jackson, 206 F.3d at 1166).

In Hargis, the Court of Appeals for the Eleventh Circuit
considered the constitutionality of an investigatory stop, where
the defendant officer had seen the plaintiff's vehicle "driving
slowly from behind a closed commercial building to the front of
the building in the early morning hours in an area he knew to
have experienced a recent string of burglaries." 586 F. App'x
at 499. The defendant had then observed the plaintiff "change[]
direction and head[] back the way he had come, essentially
making a full lap of the parking lot." Id. The Eleventh
Circuit held that the defendant had reasonable suspicion to
support the stop and thus was entitled to qualified immunity.
Id. The Court noted that it was immaterial whether the

23

plaintiff's actions could have been consistent with entirely lawful conduct, because the defendant was permitted to draw on his experience and training to make inferences based on the circumstances and to detain the plaintiff to resolve any ambiguity. Id. (citing Arvizu, 534 U.S. at 273, and United States v. Lewis, 674 F.3d 1298, 1304 (11th Cir. 2012)). Under the circumstances of that case, the Court concluded, a reasonable officer in the defendant's position could have believed that reasonable suspicion existed to support stopping the plaintiff's vehicle. Id.

Based on the totality of the circumstances here, the evidence demonstrates that Stewart had at least arguable reasonable suspicion that Plaintiff had engaged or was about to engage in criminal activity when he stopped Plaintiff's vehicle. Similar to the observations of the defendant officer in Hargis, Stewart saw Plaintiff's vehicle pull into the driveway of a seemingly abandoned house, drive around to the rear of the house, and come back down the driveway almost immediately. SMF, ¶¶ 10-12. Moreover, as in Hargis, these events occurred around 2:00 AM, in an area that Stewart knew had experienced a significant number of burglaries around that time. Stewart Dep., 32:6-7, 39:14-40:8. While Plaintiff had, in fact, pulled into the driveway of his friend's house and briefly stopped to pick up Reliford, see SMF, ¶¶ 3-4, 7-9, the ultimate lawfulness

of Plaintiff's conduct has no impact on Stewart's ability, in that moment, to draw reasonable inferences from the events that he observed and to stop Plaintiff to clear up any suspicions. Because a reasonable officer standing in Stewart's shoes could believe that there was reasonable suspicion to stop Plaintiff, Stewart's decision to do so in this case did not amount to a violation of Plaintiff's Fourth Amendment rights.

Plaintiff's arguments to the contrary are unavailing. Plaintiff asserts that reasonable suspicion did not exist, based on the lack of evidence that he committed a traffic violation or ultimately received any traffic citation for his actions. Dkt. No. 61, p. 15. However, as the Eleventh Circuit's Hargis decision makes clear, an officer's authority to conduct a traffic stop is not limited to instances where an individual has committed a traffic violation, and the ultimate lawfulness of the individual's conduct has no bearing on the officer's assessment of the circumstances prior to making the stop. See 586 F. App'x at 499 (citing Arvizu, 534 U.S. at 273, and Lewis, 674 F.3d at 1304). Additionally, Plaintiff cites case law for the proposition that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Dkt. No. 61, p. 15 (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). Plaintiff ignores that the

AO 72A
(Rev. 8/82)

Court in that case went on to note that "the relevant characteristics of a location," including whether it is a "high crime area," are nevertheless "among the relevant contextual considerations" that an officer may take into account "in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Wardlow, 528 U.S. at 124 (citing Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972)). Moreover, as detailed above, this case involved suspicious circumstances beyond recent criminal activity in the area, including Plaintiff's vehicle circling behind a presumptively abandoned house and doing so in the early morning hours.

Plaintiff also relies on United States v. Gordon, 231 F.3d 750, 756 (11th Cir. 2000), in which the Eleventh Circuit determined that a traffic stop would not have been justified if it were based solely on the individual defendant "standing, at night, within ten feet of a parked car, surrounded by largely abandoned buildings, in an area notorious for violent crime and drug trafficking." Dkt. No. 61, p. 15. Unlike in Gordon, the area in which the stop took place in this case was known not for violent crime or drug trafficking but for a significant number of recent burglaries. Stewart Dep., 40:4-6. While in Gordon, the individual's mere presence next to a parked car and abandoned buildings was in no way indicative of the commission

AO 72A
(Rev. 8/82)

of a violent crime or trafficking of drugs, the Plaintiff's conduct here—pulling into the driveway of a seemingly abandoned house, stopping briefly behind the house, and then driving back down the driveway to leave the house, SMF, ¶¶ 10–12—was highly suggestive of a burglary or attempted burglary and thus bore a stronger nexus to the precise type of crime threatening the area. As the remaining cases to which Plaintiff refers focused on only one or two contextual considerations in isolation, and did not involve the combination of factors present in this case, they do not support a different outcome on the issue of reasonable suspicion here. See Dkt. No. 61, pp. 15–16 (citing United States v. Traviesa, No. 1:08CR32-SPM, 2009 WL 1259997, at *6 (N.D. Fla. May 6, 2009) (stop was not warranted where it was based only on the plaintiff leaving a house that was the suspected location of a drug-growing operation); State v. Hopper, 666 S.E.2d 735, 737 (Ga. Ct. App. 2008) (stop was not supported by reasonable suspicion where the individual defendant "went into a suspected drug house in the middle of the afternoon, stayed for a few minutes, and then he left and drove away"). Rather, because Defendants show that there is no genuine dispute of material fact as to whether Stewart had reasonable suspicion to stop Plaintiff, the Court finds, as a matter of law, that the stop did not violate Plaintiff's Fourth Amendment rights.

AO 72A
(Rev. 8/82)

## 2. Additional Questioning

A stop that is justified by reasonable suspicion nevertheless may become unlawful if it lasts "longer than is necessary to effectuate the purpose of the stop." Pruitt, 174 F.3d at 1220 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). In the case of a routine traffic stop, for example, the detention need not go beyond the time that it takes for the officer to request a driver's license and vehicle registration, check this information on the computer, and issue a traffic citation. Id. at 1219 (citing United States v. Gonzalez-Lerma, 14 F.3d 1479, 1983 (10th Cir. 1994)). An officer may continue to detain a vehicle's occupants beyond this point consistent with the Fourth Amendment "only if the officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" Id. (quoting United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997)). Such is the case in two circumstances: (1) where the officer "has objectively reasonable and articulable suspicion illegal activity has occurred or is occurring"; or (2) where "the initial detention has become a consensual encounter." Id. at 1120 (citing Gonzalez-Lerma, 14 F.3d at 1483).

In the instant case, the parties dispute whether Plaintiff consented to Stewart continuing the stop after he learned that

AO 72A
(Rev. 8/82)

Plaintiff had no outstanding warrants. Accordingly, Defendants are not entitled to summary judgment based on consent. However, the undisputed evidence establishes that Stewart had reasonable suspicion to support the prolonged detention. The evidence demonstrates that within seconds of the dispatcher announcing that Plaintiff had no warrants, Moore radioed the "1071" warning over to Stewart. Dkt. No. 55, 2:51. Stewart understood "1071" to mean that Plaintiff was "possibly known for . . . contraband, possibly drugs." Stewart Dep., 42:1-3. Moore's warning thus provided adequate reason for Stewart to hold Plaintiff and Reliford to investigate further—including conducting additional questioning and running a warrant check on Reliford—to determine whether the two were engaged in criminal activity. Id. at 41:21-22, 55:2-5, 57:13-20; see also Pruitt, 174 F.3d at 1220 (stating that "[a] variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity" sufficient to support "[l]engthening the detention for further questioning beyond that related to the initial stop"). No reasonable juror could find a violation of Plaintiff's constitutional rights on these facts.

### 3. Pat-Down and Vehicle Searches

Ordinarily, a police officer may conduct a pat-down search of an individual's person only when the officer has reasonable suspicion that he is "dealing with an armed and dangerous

AO 72A
(Rev. 8/82)

individual." United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007) (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). An officer also may perform a warrantless search of an individual's vehicle when there is probable cause "that contraband or evidence of a crime will be found." United States v. Corley, 408 F. App'x 245, 247 (11th Cir. 2011) (quoting United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007)). However, an exception to the need for reasonable suspicion or probable cause exists where an individual gives voluntary consent to the search. See Zap v. United States, 328 U.S. 624, 628 (1946), vacated on other grounds by, 330 U.S. 800 (1947); Davis v. United States, 328 U.S. 582, 593 (1946). Consent is "voluntary" if it is "the product of an essentially free and unconstrained choice." Hudson v. Hall, 231 F.3d 1289, 1296 (11th Cir. 2000) (quoting United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)) (holding that the defendant officer was entitled to qualified immunity with respect to vehicle and pat-down searches conducted after obtaining the plaintiffs' express consent).

Here, Defendants point to evidence demonstrating that Brackett's pat-down search did not violate Plaintiff's Fourth Amendment rights in any way. Brackett's uncontradicted testimony reveals that he heard Moore's "1071" warning over the radio as he pulled up to the scene of the stop. SMF, ¶ 23; see also Brackett Dep., 28:19-29:6. Brackett understood that the

warning indicated potential involvement of contraband or drug
activity. Brackett Dep., 29:4-6. After listening to Stewart's
questioning of Plaintiff and Reliford, id. at 43:23-44:10,
Brackett performed an exterior pat down of Plaintiff's body,
"just placing his hands on the outside of [Plaintiff's]
clothing," Pl.'s decl., ¶ 21. Given the time and location of
the stop, and that Brackett reasonably suspected that Plaintiff
was involved in drug activity based on the "1071" warning, a
reasonable officer in Brackett's position would have been
justified in performing a pat-down search. See United States v.
Knight, 562 F.3d 1314, 1327 (11th Cir. 2009) (concluding that
the officer lawfully conducted a pat-down search of the driver
of a vehicle in a traffic stop, because the officer had
reasonable suspicion that the driver was in possession of drugs
and alcohol and thus posed a danger to the officer's safety);
United States v. Bentley, 151 F. App'x 824, 830 (11th Cir. 2005)
(finding that the officer's pat down of an individual in a
traffic stop was warranted for safety purposes where the stop
occurred around 3:45 AM in a high-crime area and the individual
had a drug-related criminal history); see also United States v.
Cruz, 909 F.2d 422, 424 (11th Cir. 1989) (stating that the
detective had adequate reason to suspect that the individual was
involved in drug trafficking and thus "also had the right to
make a limited protective search for concealed weapons in order

AO 72A
(Rev. 8/82)

to secure the safety of herself and the safety of those around her," because, "as is judicially recognized, such individuals are often armed").

Defendants also sustain their burden of proving that the record does not contain any facts from which a reasonable juror could infer a constitutional violation arising out of Brackett's vehicle search or Moore's pat-down and vehicle searches. The parties agree that Brackett asked Plaintiff if he could search his vehicle following the pat down, and that Plaintiff unequivocally gave him permission to do so. Pl.'s Decl. ¶ 21; Brackett Dep., 44:10-13. Additionally, according to Plaintiff's own sworn statement, Moore asked Plaintiff upon his arrival whether he could search Plaintiff's person, to which Plaintiff responded, "[Y]es you can." Pl.'s Decl., ¶ 26; see also SMF, ¶ 30; but see Pl.'s Resp. to SMF, ¶ 30; Pl.'s Dep., 53:4-20.[15] Moore then inquired about searching Plaintiff's vehicle, and Plaintiff recalls giving him the "go ahead." Pl.'s Dep., 60:7-13.[16] Because the evidence shows that Plaintiff consented to

---

[15] Although Plaintiff indicated at his deposition that Moore asked, "Do you mind if I pat you down?" Pl.'s dep., 53:4-20, he now submits in his Declaration that the officer stated, "Do you mind if I search you?" Pl.'s decl., ¶ 26. As both formulations of Moore's question contemplate, at a minimum, a pat-down search, any distinctions between the two are without consequence for the purposes of this subsection.

[16] Plaintiff's deposition testimony quotes Moore as asking, "You don't mind if I search your vehicle?" Pl.'s dep., 60:7-13, while his Declaration describes the officer as stating, with respect to Plaintiff's probationary status, "Well, then you don't mind if I

Brackett and Moore searching his vehicle and Moore patting him down, these Defendants could not have violated Plaintiff's Fourth Amendment rights in conducting these searches.

While Plaintiff concedes that he gave consent in these instances, he nevertheless contends that his consent to Moore's pat-down search was involuntary because it was the product of an allegedly unlawful prolonged detention. See Dkt. No. 61, p. 20 & n.8 (citing state law for the proposition that "consent cannot validate a search if the consent is the product of a wrongful detention" (quoting State v. Lanes, 651 S.E.2d 456, 458 (Ga. Ct. App. 2007)))).[17] Plaintiff's argument is unpersuasive, because, as discussed supra, the evidence demonstrates that the initial stop and prolonged detention of Plaintiff were justified as a matter of law. Nor is there any evidence that Brackett or Moore used threats or force to coerce Plaintiff into giving consent. See Hudson, 231 F.3d at 1296 (finding that the plaintiffs' consent to the officer's search of their car was voluntary, and noting the absence of any indication that the officer had threatened force or violence or been verbally abusive toward the

---

search your vehicle," Pl.'s decl., ¶ 27. Regardless of the exact wording used by Moore, both of Plaintiff's versions of this discussion involve Plaintiff expressly or impliedly giving Moore the "go ahead" to search the vehicle.

[17] Plaintiff also challenges his consent to Moore's body search on the basis that his consent did not extend to a strip search. Dkt. No. 61, pp. 20-21. As this discussion pertains only to the pat-down searches conducted by the Defendants, this argument is addressed in the next subsection regarding the strip search.

AO 72A
(Rev. 8/82)

plaintiffs). Thus, there is no support for finding that Plaintiff's consent to the searches of his person and vehicle was anything other than free and voluntary. Under these circumstances, Plaintiff cannot sustain a claim that the searches conducted pursuant to that consent were unreasonable.

4. Field Strip Search

Relevant to a Fourth Amendment analysis is that a probationer who has waived his rights to be free from unreasonable search and seizure as a condition to his probation has a "significantly diminished" reasonable expectation of privacy. United States v. Knights, 534 U.S. 112, 119-20 (2001). Consequently, where the Constitution ordinarily mandates that "probable cause" exist to support a warrantless search an individual's person or property, a lesser degree of probability will suffice if a probationer with a search condition is involved. Id. A police officer need have "no more than reasonable suspicion" that a probationer subject to such a condition is engaged in criminal activity to justify an intrusion on his limited privacy interests. Id. Nevertheless, a search in this context still must be "carried out in a reasonable manner and only in furtherance of the purposes of probation." Owens v. Kelley, 681 F.2d 1362, 1368-69 (11th Cir. 1982) (observing that a search may not be used in an "intimidating and harassing" fashion "to serve law enforcement

AO 72A
(Rev. 8/82)

ends totally unrelated" to the probationer's conviction or rehabilitation (quoting United States v. Consuelo-Gonzalez, 521 F.2d 259, 265 (9th Cir. 1975))).

Even in the absence of a Fourth Amendment waiver, courts in the Eleventh Circuit have determined that reasonable suspicion may justify searching an individual's private areas for evidence of contraband. See Evans v. Stephens, 407 F.3d 1272, 1279 (11th Cir. 2005) (applying the "reasonable suspicion" standard in the context of an investigative strip search of an arrestee); Sampson v. Reed, No. 1:12-CV-500-TWT, 2013 WL 1320508, at *6-7 (N.D. Ga. Mar. 28, 2013) (requiring reasonable suspicion to support a strip search of an individual following a routine stop, and reasoning, based on Evans, 407 F.3d at 1279, that "the constitutional requirements for such searches of a person who has been arrested would apply at a minimum to a person who has not yet been arrested" (quoting Richardson v. Quitman Cty., 912 F. Supp. 2d 1354, 1373 (M.D. Ga. 2012))), aff'd, 536 F. App'x 989 (11th Cir. 2013); Richardson, 912 F. Supp. 2d at 1373 (same).

While the parties here dispute whether Plaintiff's consent to Moore's body search was limited to a pat down or extended to a strip search, see dkt. no. 43-2, pp. 10-11; dkt. no. 61, pp. 20-21, the Court need not reach this issue, because Moore had reasonable suspicion to conduct the search under the

circumstances of this case. The undisputed facts establish that, on the night in question, Plaintiff was on probation and had waived his Fourth Amendment rights as a condition thereto—facts known by Moore at the time of the strip search. SMF, ¶¶ 32-34; Pl.'s Dep., 53:17-20.[18] Additionally, Moore was aware of several facts that led him to believe that Plaintiff was in possession of contraband: (1) Plaintiff's prior conviction had involved drugs; (2) Plaintiff exhibited suspicious body language during the stop, going beyond mere nervousness to include unusual posture, eye movements, and shifting of his weight back and forth; (3) he repeatedly cautioned the officers that "if anything was in that truck 'it ain't [his]' because he had just bought it"; (4) he was travelling with Reliford, who had a known history of prostitution and drug use and had just lied to the officers about her identity; and (5) the friend's house that Plaintiff had just visited was known for drug use and other illegal activity. Moore Dep., 51:21-52:11, 55:9-14, 58:20-22,

---

[18] The parties stipulate that Moore already knew that Plaintiff was on probation. SMF, ¶ 33. While their stipulation says nothing about Moore's knowledge of the search condition attached to Plaintiff's probation, there is some evidence indicating that Moore was aware of this condition by the time that he began searching Plaintiff's vehicle. See Pl.'s Decl., ¶ 27 (attesting that Moore, after discussing Plaintiff's probation with him, gathered that Plaintiff would not mind if he searched the vehicle); but see Pl.'s Dep., 60:7-13 (suggesting that Moore merely asked for Plaintiff's consent to search the vehicle). Even assuming, however, that Moore did not know about Plaintiff's probation condition at the relevant time, the prevailing case law, set forth herein, counsels that the strip search nevertheless be held to a reasonable suspicion standard.

66:24-67:22. That the officers had not uncovered any illegal substances in Plaintiff's vehicle did not lessen—but, under these facts, perhaps increased—the probability that Plaintiff had the same on his person. A police officer in these circumstances would have had reasonable suspicion that Plaintiff was hiding drugs under his clothes and that a strip search would uncover the same. See Hudson, 231 F.3d at 1298 (noting the common practice of hiding drugs near one's genitals (citing United States v. Rodney, 956 F.2d 295, 297 (D.C. Cir. 1992)).

Nevertheless, contrary to Defendants' arguments, see dkt. no. 43-2, p. 11, there is evidence suggesting that Moore did not perform the strip search in a reasonable manner. It is undisputed that the search occurred on the side of the road in the early morning hours, and that no cars or civilians passed by the scene during that time. See Pl.'s Decl., ¶¶ 15-16; SMF, ¶¶ 10, 16, 40-41. The record also shows that Moore took several steps to ensure that the search was out of the view of the other officers or potential onlookers, including leading Plaintiff to the area between the front bumper and the front wheel on the driver's side of the vehicle and opening the driver's side door as a shield. Pl.'s Decl., ¶ 28; Pl.'s Dep., 62:19-22, 63:6-11, 63:13-14. Despite those measures, there is affidavit evidence sufficient to support a finding that Reliford, the only female on the scene, watched the strip search take place and saw

AO 72A
(Rev. 8/82)

Plaintiff expose his genitals. See Reliford Aff., ¶ 8.

Reliford affies that Moore "ordered [Plaintiff] to pull his pants or shorts down," and that Plaintiff "reluctantly complied with the officer's demand," id., implying that she was in a position to observe Plaintiff's demeanor and actions in response to the officer's command. A reasonable juror could conclude on these facts that Moore's decision to conduct a strip search in plain view of a female onlooker was unreasonable and thus amounted to a violation of Plaintiff's constitutional rights. See Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing that an individual in police custody has a constitutional right to bodily privacy, and, as a result, an officer cannot direct him to involuntarily expose his genitals in the presence of the opposite sex (quoting Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people . . . have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating."))); McCloud v. Fortune, No. 4:05CV101-RH/WCS, 2005 WL 3274648, at *2 (N.D. Fla. Dec. 2, 2005) (finding that it was unlawful to conduct full strip searches of females "along a public highway in full view of male officers"), aff'd in part, 262 F. App'x 947 (11th Cir. 2008); see also Mitchell v. Stewart, 608 F. App'x 730, 735 (11th Cir. 2015) ("[A]bsent a legitimate reason, individuals maintain

AO 72A
(Rev. 8/82)

a right to bodily privacy, in particular the right not to have their genitals exposed to onlookers."); Sampson, 2013 WL 1320508, at *8 (finding a genuine issue of material fact as to whether the police officers violated the plaintiff's rights by conducting a strip search in the middle of the afternoon in a public parking lot near a mall, in the presence of at least three witnesses), aff'd, 536 F. App'x 989 (11th Cir. 2013).[19]

### C. Clearly Established Right

For the law to be "clearly established" such that a plaintiff can overcome the qualified immunity defense, "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (internal quotation marks omitted) (quoting Lassiter v. Ala. A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994)); see also

---

[19] To the extent that he seeks to do so, Plaintiff cannot sustain a Fourth Amendment claim against Stewart or Brackett on the basis of the field strip search. A police officer who is present while another officer violates an individual's constitutional rights cannot be liable for the constitutional violation if he or she is not in a position to intervene. See Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986). As the record evidence in this case establishes that neither Stewart nor Brackett had any knowledge that a strip search was taking place at the front of the vehicle, Stewart dep., 85:18-22; Brackett dep., 64:12-19, these officers could not have intervened to stop the search and cannot now be liable for any potential constitutional violation arising therefrom.

Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) ("[The] 'clearly established' standard demands that a bright line be crossed."). Where the existing case law "has not staked out a bright line" showing that a particular course of police conduct is clearly unconstitutional, "qualified immunity almost always protects the defendant," Post, 7 F.3d at 1557 (citing Dartland v. Metro. Dade Cty., 866 F.2d 1321, 1323 (11th Cir. 1989)), unless the plaintiff can show that the defendant's actions were "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official" even without caselaw on point, Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).

Plaintiff's Response to the instant Motion does not cite any legal precedent that would have put Stewart, Brackett, and Moore on notice that their actions in stopping and questioning Plaintiff and conducting pat-down and vehicle searches were unlawful. See Dkt. No. 61, pp. 14-18. Rather, as discussed supra, it is Defendants who identify case law confirming that their conduct in these instances was entirely within legal bounds, and Plaintiff fails to distinguish those cases or otherwise convince the Court that the rulings are inapplicable. Plaintiff's Section 1983 claims based on these actions thus fail for this additional reason.

As to his claim against Moore concerning the field strip search, however, Plaintiff sets forth Eleventh Circuit case law making it clear, at that time, that forcing an individual to undergo a strip search in view of a member of the opposite sex was unconstitutional. See id. at pp. 18-19 (citing Mitchell, 608 F. App'x at 735; and Fortner, 983 F.2d at 1030). If Moore did, in fact, direct Plaintiff to pull his shorts down and expose his genitals within Reliford's view, then his actions violated clearly established law and subject him to liability under Section 1983.

In sum, Plaintiff fails to put forth any evidence that either Stewart or Brackett violated his clearly established federal rights and, therefore, cannot overcome the application of qualified immunity as to these Defendants. Qualified immunity completely shields Stewart and Brackett from liability for their discretionary actions in these circumstances, such that no reasonable jury could find for Plaintiff on his Section 1983 claims against these Defendants. Defendants' Motion is, therefore, **GRANTED** in that Stewart and Brackett are entitled to judgment in their favor on these claims. Plaintiff, however, succeeds in demonstrating, at this stage, that Moore acted against clearly established law in conducting the field strip search and is not immune from suit on these grounds. The Motion

AO 72A
(Rev. 8/82)

is thus **DENIED** as it relates to Plaintiff's claim against Moore.[20]

## III. State-Law Claims Against Stewart, Brackett, and Moore in Their Individual Capacities

Defendants assert that official immunity protects Stewart, Brackett, and Moore from Plaintiff's claims of unreasonable search and seizure, intentional infliction of emotional distress, invasion of privacy, and abuse of an arrestee under Georgia law. Dkt. No. 43-2, pp. 15-17.

The Georgia Constitution enshrines the principal of official immunity, stating that a public official must not be subject to suit for the performance of discretionary functions unless he "act[s] with actual malice or with actual intent to cause injury." Gilbert v. Richardson, 452 S.E.2d 476, 482-83 (Ga. 1994) (quoting Ga. Const. art. I, § 2, para. 9(d)). "Actual malice" denotes "express malice or malice in fact," which require "a deliberate intention to do wrong." Merrow v.

---

[20]  While Defendants argue that Plaintiff cannot sustain a Section 1983 claim against the City, dkt. no. 43-2, pp. 12-15, Plaintiff's Complaint alleges only state-law claims against this Defendant, see dkt. no. 1, ¶¶ 47-49, 52-53. Even if Plaintiff had intended to assert a Section 1983 claim against the City, Plaintiff's Response to the instant Motion does not object to Defendants' arguments for a dismissal of such claim and, as such, would reflect Plaintiff's abandonment of the same. See Clark v. City of Atlanta, 544 F. App'x 848, 855 (11th Cir. 2013) ("The district court, therefore, properly treated as abandoned the [plaintiffs'] excessive force and state law claims, which were alleged in the complaint, but not addressed in opposition to the motion for summary judgment.").

Hawkins, 467 S.E.2d 336, 337-38 (Ga. 1996) (quoting Black's Law Dictionary (6th ed. 1990)). In this way, actual malice is distinct from "malice," which Georgia courts have defined as exhibiting "reckless disregard for the rights of others," as well as the concept of "implied malice" embracing conduct that demonstrates a "reckless disregard for human life." Id. at 338. Nor does mere ill will or "rancorous personal feelings" toward a plaintiff rise to the level of actual malice when paired with a lawful act. Phillips v. Hanse, 637 S.E.2d 11, 13 (Ga. 2006) (citing Merrow, 467 S.E.2d at 337). "Actual intent to cause injury," by contrast, requires intent to cause the harm suffered by the plaintiff and "not merely an intent to do the act purportedly resulting in the claimed injury." Selvy v. Morrison, 665 S.E.2d 401, 405 (Ga. Ct. App. 2008) (quoting Kidd v. Coates, 518 S.E.2d 124, 124 (Ga. 1999)).

As an initial matter, Plaintiff's claims of unreasonable search and seizure under the Georgia Constitution against Stewart and Brackett must fail based on the Court's determination that his Fourth Amendment claims against these Defendants do not survive summary judgment. See Oswell v. State, 351 S.E.2d 221, 222 (Ga. Ct. App. 1986) (finding that because a vehicle search was not unreasonable under the Fourth Amendment, it also was not unreasonable under the identical provision of the state Constitution). Even if the Court had not

43

made this finding, however, official immunity protects Stewart, Brackett, and Moore from liability for an unreasonable search and seizure, as well as any actions constituting intentional infliction of emotional distress, invasion of privacy, and abuse of an arrestee, under the facts of this case. The officers' execution of the initial traffic stop and subsequent investigation of Plaintiff's person and vehicle were discretionary acts, as discussed previously. Plaintiff does not point to any evidence to support his bare assertion that the officers acted with actual malice while performing these functions. See Dkt. No. 61, pp. 22-23. Nor can he, as nothing in the record suggests that either Stewart, Brackett, or Moore targeted, threatened, or otherwise treated Plaintiff in such a way that would support the conclusion that the officers intended to violate his rights. Because Plaintiff cannot establish this requirement to abrogate official immunity, Plaintiff cannot succeed on his state-law claims against these Defendants in their individual capacities. Defendants' Motion is thus **GRANTED** as to these claims.

## IV. State-Law Claims Against Stewart, Brackett, and Moore in Their Official Capacities and the City

Defendants assert that sovereign immunity protects the officers in their official capacities and the City from being sued for alleged state-law violations arising out of the actions

AO 72A
(Rev. 8/82)

of the officers. Dkt. No. 43-2, pp. 15-17. Defendants also rely on sovereign immunity as a bar to Plaintiff's state-law claims against the City based on its own alleged failure to supervise and negligent retention, hiring, and training of the officers. Id.

## A. Sovereign Immunity

The doctrine of sovereign immunity under the Georgia Constitution protects the State and its departments and agencies from legal action. Cameron v. Lang, 549 S.E.2d 341, 346 (Ga. 2001) (citing Gilbert v. Richardson, 452 S.E.2d 476, 481 (Ga. 1994)). A suit against a police officer in his official capacity is, in reality, a suit against the State itself and, therefore, implicates principles of sovereign immunity. Id. (citing Gilbert, 452 S.E.2d at 481). Significantly, the Georgia Constitution provides that the Georgia General Assembly may waive the immunity of the State and its departments, agencies, and officers by statute. Id. (citing Ga. Const. art. IX, § 2, para. 9; id. at art. I, § 2, para. 9).

The Georgia Code sets forth the general rule that "there is no waiver of the sovereign immunity of municipal corporations of the state and such municipal corporations shall be immune from liability for damages." O.C.G.A. § 36-33-1(a) ("Section 36-33-1(a)"). It also specifies that "a municipal corporation shall not be liable for the torts of policemen or other officers

AO 72A
(Rev. 8/82)

engaged in the discharge of the duties imposed on them by law." Id. § 36-33-3. However, pursuant to Section 36-33-1(a), while a municipal corporation does not automatically waive its sovereign immunity by purchasing liability insurance, the city's purchase of insurance does result in a waiver of immunity where the policy of insurance issued covers the exact type of occurrence for which the defense of sovereign immunity is being asserted. O.C.G.A. § 36-33-1(a). In such circumstances, the city may be liable for the acts of its officials under the doctrine of respondeat superior. See, e.g., Durben v. Am. Materials, Inc., 503 S.E.2d 618, 619 (Ga. Ct. App. 1998). The party seeking to hold a city or city officer liable bears the burden of proving a waiver of immunity. Doss v. City of Savannah, 660 S.E.2d 457, 462 (Ga. Ct. App. 2008).

Plaintiff puts forth sufficient evidence, at this stage, to show that the City and the officers in their official capacities are not entitled to sovereign immunity against the state-law claims. Plaintiff's submission of the Common Policy Declarations issued by the City's insurer reveals that the City maintained liability insurance coverage during the relevant time period. See Dkt. No. 57, pp. 3-6. Significantly, the Common Policy Declarations include coverage for "Law Enforcement Liability" up to a specified dollar amount. Id. at p. 5. As the City retained insurance coverage for the operations of the

police department—the precise activity at issue here—the City has waived immunity against Plaintiff's claims to the extent of the policy limits.

## B. Claims Based on the Officers' Conduct

### 1. Unreasonable Search and Seizure

The Georgia Constitution tracks the language of the Fourth Amendment's proscription on unreasonable searches and seizures. Ga. Const. art. I, § 1, para. XIII. As noted above, Georgia courts interpret the state constitutional provision as prohibiting the same conduct as its federal counterpart. See Oswell, 351 S.E.2d at 222. Because the Court finds that Plaintiff's Fourth Amendment claims of unreasonable search and seizure against Stewart and Brackett fail as a matter of law, Plaintiff's analogous claims under state law must fail for the same reason, and this portion of Defendants' Motion is **GRANTED**. However, because the Court concludes that Plaintiff's Fourth Amendment claim against Moore survives summary judgment, Plaintiff's similar state-law claim likewise withstands dismissal at this time and subjects the City to potential liability on the basis of respondeat superior. Defendants' Motion is thus **DENIED** as to the state-law claims of unreasonable search and seizure against Moore in his official capacity and the City.

AO 72A
(Rev. 8/82)

## 2. Intentional Infliction of Emotional Distress

To sustain a claim of intentional infliction of emotional distress under Georgia tort law, a plaintiff must satisfy four elements: "(1) [t]he conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; and (4) [t]he emotional distress must be severe." Northside Hosp., Inc, v. Ruotanen, 541 S.E.2d 66, 68-69 (Ga. Ct. App. 2000). In the present case, the record fails to show that the officers' execution of the traffic stop and subsequent investigation were anything other than ordinary law-enforcement activities, much less that these actions rose to the level of "extreme and outrageous" conduct. More importantly, Plaintiff does not contend—and nothing in the record suggests—that Plaintiff suffered any emotional distress following these events. Defendants' Motion is, therefore, **GRANTED** as to these claims.

## 3. Invasion of Privacy

The invasion of one's right to privacy is actionable in tort under Georgia common law. Cabaniss v. Hipsley, 151 S.E.2d 496, 500 (Ga. Ct. App. 1966). The action of invasion of privacy is comprised of four loosely related but distinct torts: "(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing

AO 72A
(Rev. 8/82)

private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." Id. In other words, the tort of invasion of privacy largely protects against the "unwarranted publicity, ... [or] the unwarranted appropriation or exploitation of one's personality, [or] the publicizing of one's private affairs with which the public had no legitimate concern." Gouldman-Taber Pontiac, Inc. v. Zerbst, 100 S.E.2d 881, 882 (Ga. 1957) (first alteration in original) (citing 41 Am. Jur. 925, 934, §§ 2, 12); see also Toffoloni v. LFP Publ'g Grp., LLC, 572 F.3d 1201, 1206 (11th Cir. 2009). As it is undisputed that this case does not involve any publicized information about Plaintiff, the only type of privacy invasion that could possibly be implicated by these facts is that of an intrusion on Plaintiff's seclusion or solitude.

This branch of Georgia's privacy tort "involves an unreasonable and highly offensive intrusion upon another's seclusion." Summers v. Bailey, 55 F.3d 1564, 1566 (11th Cir. 1995). Georgia courts traditionally have recognized that a "physical intrusion analogous to a trespass" is sufficient to recover under this theory. Davis v. Emmis Publ'g Corp., 536 S.E.2d 809, 811 (Ga. Ct. App. 2000) (quoting Cox Commc'ns v. Lowe, 328 S.E.2d 384 (Ga. Ct. App. 1985)); see, e.g., Cabaniss,

AO 72A
(Rev. 8/82)

151 S.E.2d at 500 (collecting cases demonstrating that a trespass into another's house, hotel room, or hospital room constituted an intrusion upon his seclusion or solitude). More recently, Georgia courts have expanded the definition of "unreasonable intrusion" to include any "prying or intrusion, which would be offensive or objectionable to a reasonable person, into a person's private concerns." Sitton v. Print Direction, Inc., 718 S.E.2d 532, 537 (Ga. Ct. App. 2011) (quoting Yarbray v. S. Bell Tel. & Tel. Co., 409 S.E.2d 835 (Ga. 1991)); see, e.g., Summers, 55 F.3d at 1566 & nn.7-9 (collecting cases finding an unreasonable intrusion in instances of eavesdropping by microphone, peering into the window of another's house, and, under certain circumstances, running surveillance on another from a public road).

On the record in this case, no reasonable juror could find that Stewart, Brackett, or Moore intruded on Plaintiff's seclusion. As discussed above, the officers were on duty when the alleged events occurred, and they had reasonable suspicion that Plaintiff was engaged in some form of criminal activity at all relevant times. The officers' decisions to stop Plaintiff and search his person and vehicle were justified under these circumstances and, for the most part, complied with federal and state constitutional requirements. As a result, the officers cannot be said to have unlawfully intruded upon Plaintiff's

seclusion in taking these actions.  Defendants' Motion as to

Plaintiff's state-law privacy claims is thus **GRANTED.**

### 4. Abuse of an Arrestee

The Georgia Constitution states, in pertinent part, that no

person "shall . . . be abused in being arrested, while under

arrest, or in prison." Ga. Const. art. I, § 1, para. 17. As a

preliminary matter, the Court notes that it is arguable whether

the Georgia Constitution's prohibition on abuse of an arrestee

even applies to individuals who, like Plaintiff, are subject to

an investigatory stop. See Long v. Jones, 432 S.E.2d 593, 594

(Ga. Ct. App. 1993) (describing this provision as guaranteeing a

right "not to be abused while under arrest and detained for

trial"). However, even assuming that this provision protects

Plaintiff in this case, the facts here fail to indicate that

Stewart, Brackett, and Moore engaged in any conduct rising to

the level of abuse contemplated under this provision. See id.

at 595 (explaining that the provision provides as much

protection as the Fourteenth Amendment Due Process Clause, which

prohibits "punishment" of a pretrial detainee). To the

contrary, the record shows only that the officers searched

Plaintiff's person and vehicle, and did so using lawful means,

during the relatively brief period of his detention. Cf. id.

(holding that a genuine issue of material fact existed as to

whether officers violated the abuse-of-an-arrestee provision by

"continuously restraining [the detainee] with leg irons, waist chains, and handcuffs for a period of twenty-two days while he was being held in a cell at the jail"); see also Pearson v. Wimbish, 52 S.E. 751, 751 (Ga. 1906) (finding a violation of this provision where "one charged with the infraction of a municipal ordinance is sentenced to confinement for three months in the county chain gang, along with violaters [sic] of the laws of the state, upon conviction by the recorder alone and without a right to a trial by a jury, and with no record except certain entries upon the recorder's docket"). Accordingly, Defendants' Motion in this regard is **GRANTED**.

### C. Claims Based on the City's Alleged Failure to Supervise and Negligent Retention, Hiring, and Training of Its Officers

Plaintiff also fails to introduce evidence demonstrating that the City could be liable for failing to properly supervise or negligently retaining, hiring, or training the officers. Where a city is not expressly required by statute to perform a given act, it may not be held liable for exercising its discretion in failing to perform that act. O.C.G.A. § 36-33-2. Notably, "[t]he operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function of the municipality as opposed to a ministerial, proprietary, or administratively routine function." Lowe v. Jones Cty., 499 S.E.2d 348, 350 (Ga.

AO 72A
(Rev. 8/82)

Ct. App. 1998) (quoting McDay v. City of Atlanta, 420 S.E.2d 75, 75 (Ga. Ct. App. 1992)).  A city may be liable based on the exercise of such a discretionary function "only when the acts complained of are done within the scope of the officer's authority and with wilfulness, malice or corruption."  Id. (citing McDay, 420 S.E.2d at 75).

Here, the City was acting in a discretionary capacity when it established policies and procedures for its police department.  There is no evidence in the record that would support a finding that either the City or Stewart, Brackett, or Moore engaged in any willful, malicious, or corrupt conduct while performing their discretionary functions.  Accordingly, the City, as a matter of law, cannot be liable for its supervision and employment of the officers.  Defendants' Motion is thus **GRANTED** in that the City is entitled to judgment in its favor on this claim.

## V. Claims for Punitive Damages Against Moore and Attorneys' Fees Against Moore and the City

Finally, Defendants argue that Moore and the City are entitled to judgment in their favor on Plaintiff's claims for punitive damages and attorneys' fees.  Dkt. No. 43-2, pp. 17-18. The Court agrees and finds that there is no basis upon which a reasonable juror could award punitive damages or attorneys' fees to Plaintiff.  As described above, Plaintiff fails to point to

any evidence that Moore acted with malice or reckless or conscious indifference, as is required to support an award of punitive damages. See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999) (stating that "malice or . . . reckless indifference to the [plaintiff's] federally protected rights" justifies an award of punitive damages under Section 1983 (alteration in original) (emphasis removed)); O.C.G.A. § 51-12-5.1(b) (allowing punitive damages in tort actions upon a showing of "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences"). Nor would Plaintiff succeed in proving entitlement to attorneys' fees, as there is no support in the record for a finding that either Moore or the City has acted in bad faith or caused unnecessary trouble or expense in this litigation. See O.C.G.A. § 13-6-11 (providing for attorneys' fees where a party "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense"). Defendants' Motion for judgment in their favor on these claims is **GRANTED**.

### CONCLUSION

For the foregoing reasons, Defendants' Motion (dkt. no. 43) is **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** in that Stewart and Brackett are entitled to summary judgment in

their favor on all claims against them, and the Clerk of Court is **DIRECTED** to terminate these Defendants from this action.

The Motion also is **GRANTED** to the extent that summary judgment in Moore's favor is appropriate on Plaintiff's state-law claim of unreasonable search and seizure against him individually; the state-law claims of intentional infliction of emotional distress, invasion of privacy, and abuse in arrest against him in his individual and official capacities; and the federal and state-law claims for punitive damages against him. The Motion, however, is **DENIED** as it relates to the Section 1983 claim against Moore and the state-law claim of unreasonable search and seizure against him in his official capacity.

Further, Defendants' Motion is **GRANTED** in that the City is entitled to a ruling in its favor on Plaintiff's state-law claims of intentional infliction of emotional distress, invasion of privacy, abuse in arrest, failure to supervise and negligent retention, and punitive damages. The Motion is **DENIED** insofar as it seeks summary judgment on Plaintiff's state-law claim of unreasonable search and seizure against the City.

**SO ORDERED**, this 29TH day of September, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)